IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ODELL A. NEAL, II                    :

      Plaintiff,               :

  v.                               :   Civil Action No. DKC 05-173

PRIORITY ONE SERVICES, INC.          :

      Defendant.               :

## MEMORANDUM OPINION

Plaintiff Odell A. Neal, II ("Neal" or "Plaintiff") brings this action alleging violations of the Americans with Disabilities Act ("The Act"), 42 U.S.C. § 12203(a) and Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a), against his former employer, Priority One Services, Inc., ("Priority" or "Defendant"). Count One alleges failure to accommodate and discriminatory discharge based upon disability. Count Two alleges retaliatory discharge in response to Plaintiff's request for accommodation of a disability. Currently pending is Defendant's Motion for Summary Judgment (Paper 31). The issues are fully briefed and no hearing is deemed necessary. *See* Local Rule 105.6 (D. Md. 2004). For the reasons stated below, the Court will grant Defendant's Motion for Summary Judgment.

## BACKGROUND

The following facts are uncontroverted or set forth in the light most favorable to Plaintiff. Plaintiff was employed by Defendant as an animal caretaker, beginning as a small animal caretaker, and later transferring to the position of large animal

caretaker.   (Paper 36, Ex. 3, Neal Dep. at 30-31).   His duties consisted of manual labor, including moving fifty pound bags of monkey chow, pushing rocks in excess of 250 pounds, sweeping, mopping, waste removal, changing pans, and maintaining racks and watering systems for the storage of live animals.   (Paper 36, Ex. 3, Neal Dep. at 32-33; Paper 32, Ex. 2).

On  September 30, 2003, Plaintiff suffered an injury to his right hand while working.   (Paper 36, Ex. 3, Neal Dep. at 38). Plaintiff was rushed to the Suburban Hospital Emergency Room, where he was referred to Dr. Arthur Jabs, a specialist who subsequently performed a fasciotomy on the Plaintiff's hand on October 6, 2003. (Paper 36, Ex. 5 at 70).   From October through December 2003 Plaintiff underwent occupational therapy approximately three times a week.   (Paper 32, Ex. 10 at 3).   In January 2004, Plaintiff began work hardening sessions, in which he would dip his hand in hot wax, transfer water from one bucket to another, wring water from a towel, carry milk crates containing bricks, and walk on a treadmill.   (Paper 36, Ex. 3, Neal Dep. at 137).   These exercises were meant to simulate activities from Plaintiff's work.   (Paper 36, Ex. 3, Neal Dep. at 43-44).   Under the guidance of Dr. Jabs, Plaintiff began wearing a compression glove to counter the continued swelling.   (Paper 36, Ex. 3, Neal Dep. at 20-23).

As a result of the injury, Plaintiff had to wake up earlier in the morning to obtain assistance with bathing, getting dressed and

brushing his teeth. (Paper 36, Ex. 3, Neal Dep. at 12). His injury forced him to conduct many of these activities with his left hand. *Id*. Despite the work hardening, Plaintiff continued to have swelling in his hand, resulting in a recommendation from one of the therapists that Plaintiff seek another opinion. (Paper 36, Ex. 3, Neal Dep. at 76).

During this period, Defendant provided Plaintiff with a leave of absence and Plaintiff received workers' compensation benefits. (Paper 32, Ex. 8). Plaintiff provided Defendant's Human Resources Coordinator, Erin Murphy, with copies of his prescriptions during his leave of absence and reported intermittently with his supervisor, Jerome Albright, about his progress in work hardening. (Paper 36, Ex. 3, Neal Dep. at 62). When Plaintiff asked if there was any work that he could do while recovering, Albright told him that he needed to be 100 percent before returning, that there was no light duty available, and that he could not work as a small animal caretaker if he was not 100 percent because he would need to be able to close his hand to pick up the animals. (Paper 36, Ex. 3, Neal Dep. at 63-64). Plaintiff inquired about other positions such as answering phones, but was told that all of those positions were full. (Paper 36, Ex. 3, Neal Dep. at 64). Additionally, Plaintiff spoke to Erin Murphy, who indicated that there were other positions in other jurisdictions, but concluded that Plaintiff was

not qualified for any of the positions at that time.  (Paper 36, Ex. 3, Neal Dep. at 143).

Plaintiff retained an attorney at the beginning of March 2004 to pursue a claim for his injuries.  (Paper 32, Ex. 7).  Defendant was notified by letter of the attorney's involvement.  *Id.*

Dr. Jabs issued a note on January 28, 2004, indicating that Plaintiff needed two additional months of work hardening.  This note was forwarded to Erin Murphy.  (Paper 32, Ex. 6).  In March of 2004, Ms. Murphy began calling Plaintiff, leaving messages that he was expected to return to work on March 29, 2004.  (Paper 32, Ex. 1, Murphy Aff. at 1).  On March 30, 2004, Plaintiff informed Ms. Murphy that he had not been released by his doctors.  *Id.*  Ms. Murphy then contacted Defendant's workers' compensation carrier, AIG, which informed her that Plaintiff had been cleared by Dr. Jabs to return on March 29, 2004.  *Id.*  However on April 1, 2004, Dr. Jabs requested that Plaintiff complete four more weeks of work hardening before his release on April 28, 2004.  (Paper 32, Ex. 9). According to Dr. Jabs, "Mr. Odell Neal was incorrectly released to full duty on 3/31/04 due to an error in transcription from rehab at work on 3/23/04."  (Paper 32, Ex. 9).  Having corrected his report, Dr. Jabs released Plaintiff to return to work on April 28, 2004. (Paper 32, Ex. 9).

Despite the work hardening, Plaintiff continued to have swelling in his hand, resulting in a recommendation from his Work

Hardening Coordinator, Darryl Jones, that Plaintiff be referred to a hand specialist for a possible surgical consult. (Paper 36, Ex. 5 at 17). On April 30, 2004, his work hardening progress note indicates that his limiting factors for return to work were increased pain with rapid swelling which contributed to decreases in active range of motion. *Id*. Jones stated that he did not believe Plaintiff was ready to return to his job as a caretaker. *Id*. At that time, Plaintiff was capable of carrying sixty pounds 100 feet and was working at a workplace tolerance of four hours per day. *Id*. Plaintiff also continued to have a burning sensation at the middle and index fingers after activity or lifting a load. *Id*.

Plaintiff received an Independent Medical Examination("IME"), on April 14, 2004. (Paper 32, Ex. 10). The Examiner, Dr. Higgins, did not anticipate significant improvement with persistent physical therapy or work hardening, opined that Plaintiff had sustained a sixteen percent permanent partial impairment of the right upper extremity, concluded that Plaintiff was fit to be released to work a medium capacity job, and recommended that Plaintiff discontinue treatment and return to work as a large animal caretaker for observation. *Id*. Dr. Higgins further stated that Plaintiff's job duties as a large animal caretaker were classified as a "medium" physical demand job. *Id*.

As a result of the IME, Plaintiff's workers' compensation benefits were terminated on May 4, 2004. (Paper 32, Ex. 10). That

day, Plaintiff's physical therapist was told to cease Plaintiff's work hardening program. (Paper 36, Ex. 3, Neal Dep. at 58). Plaintiff was told to leave work hardening without being given an Exit Exam. (Paper 36, Ex. 3, Neal Dep. 59). The IME report was faxed to Ms. Murphy in Human Resources at Priority One and sent to Plaintiff's attorney on May 4, 2004. (Paper 32, Ex. 11). Plaintiff was notified of the IME findings by his attorney around this time. (Paper 36, Ex. 3, Neal Dep. at 57).

Plaintiff was terminated on May 12, 2004. (Paper 32, Ex. 14). According to Defendant, he was terminated for violating its personnel policies by failing to report to work after May 4, 2004. *Id.* Plaintiff, however, claims that he did not know that Defendant expected him to report to work in May. (Paper 36, Ex. 3, Neal Dep. at 69). He admitted that he received a phone message from Mr. Albright between May 4 and May 12, asking that he call into work, but nothing was said about his job being in jeopardy. (Paper 36, Ex. 3, Neal Dep. at 68, 122). Plaintiff called back and left a message but never spoke directly with anyone before the termination date. (Paper 36, Ex. 3, Neal Dep. at 124). Plaintiff did not report to work during this period (Paper 36, Ex. 3, Neal Dep. at 92).

On May 10, 2004, Plaintiff filed a request for an emergency hearing with the Worker's Compensation Commission, which was denied on May 18, 2004. (Paper 32, Ex. 13). On June 12, 2004, Dr. Jabs

stated that Plaintiff was capable of working full time.  (Paper 32, Ex. 18).  On August 11, 2004, the Worker's Compensation Commission denied Plaintiff's request for continuing benefits and request for further medical treatment after May 5, 2004.  (Paper 32, Ex. 20).

Plaintiff did not see another doctor until August 23, 2004, when he was examined by Dr. Jonathan Rosenfeld, who recommended one month of occupational therapy to be followed by an evaluation. (Paper 32, Ex. 21).  Dr. Rosenfeld's notes indicate that the goal of the therapy was a full fist and return to work.  *Id*.

Since May 2004, Plaintiff has worked as an automotive parts counter clerk where his duties include searching for parts on a computer and retrieving parts for customers.  As of February 2005, Plaintiff has also worked as a courtesy shuttle driver.  (Paper 36, Ex. 3, Neal Dep. at 15-20).

On September 15, 2004, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that he was terminated due to his disability. (Paper 32, Ex. 22).  After the EEOC dismissed the charge, Plaintiff filed this Complaint on January 25, 2005, claiming that Priority violated the Americans with Disabilities Act ("ADA") by terminating him because of his disability and retaliated against him by terminating him for requesting accommodations.  (Paper 1, at 4-5).

## STANDARD OF REVIEW

It is well established that a motion for summary judgment will be granted only if: (a) there exists no genuine issue as to any material fact and (b) the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden of showing that these two conditions are met.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 325.  However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary

judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir. 1997), *cert. denied*, 522 U.S. 810 (1997).

## DISCUSSION

I.   <u>Failure to Accommodate and Discriminatory Discharge.</u>

Count One combines allegations that Defendant violated the ADA, first by failing to make reasonable accommodations for Plaintiff's injury, and subsequently by terminating him because of his injury.

A.   <u>Accommodation</u>.

The accommodation claim fails because Plaintiff did not exhaust his administrative remedies, cannot show that any accommodation was reasonably available, and is not an individual with a disability as defined by the ADA.

Plaintiff's EEOC charge did not include any facts or allegations relating to a failure to accommodate.  The charge states solely that the Plaintiff was terminated in March 2004 due to his disability.  (Paper 32, Ex. 22).[1]  Plaintiff claims that he discussed his request for accommodations with the EEOC investigator, (Paper 36 at 8), but even if he did, "[t]he suit filed may encompass only the 'discrimination stated in the charge itself or developed in the course of a reasonable investigation of that charge.'"  *King v. Seaboard Coast Line R.R. Co.*, 538 F.2d 581,

---

[1] The termination actually occurred on May 12, 2004.  (Paper 32, Ex. 14).

583 (4th Cir. 1976) (citing *Equal Employment Opportunity Comm'n v. Gen. Elec. Co.*, 532 F.2d 359, 365 (4th Cir. 1976)).  Plaintiff's alleged request for accommodations was neither stated in his charge nor developed during investigation.  *See, e.g., Mayers v. Wash. Adventist Hosp.*, 131 F.Supp.2d 743, 747 (D.Md.)("The charge specifically confines the dates of the alleged discrimination to the day of Plaintiff's termination, setting the earliest and latest dates at June 21, 1999.  The charge is completely devoid of any reference to her alleged request for accommodation in May 1999. Under these circumstances, the Court cannot find that the EEOC charge encompassed a claim for failure to make reasonable accommodations.")(citing *Jones v. Sumser Ret. Vill.*, 209 F.3d 851 (6th Cir. 2000)(Employee did not exhaust administrative remedies as to ADA failure-to-accommodate claim when she filed Equal Employment Opportunity Commission (EEOC) charge alleging termination based on disability; charge did not explicitly allege failure to accommodate, nothing in charge pointed to any claim other than improper refusal to keep her job open while she recovered, and, although charge was filed pro se and stated last date she worked, claim that she became unable to work on that date due to failure to accommodate did not reasonably grow out of charge.)), *aff'd*, 22 Fed.Appx. 158 (4th Cir. 2001).

Plaintiff argues that his charge should be liberally construed on "equitable tolling grounds," because he was acting *pro*

*se* and because he discussed accommodations with the EEOC investigator. (Paper 36, Ex. 1 at 3). Plaintiff relies on *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393-98, *reh'g denied*, 456 U.S. 940 (1982), in which the Supreme Court held that a failure to file a charge with the EEOC within the time deadline could be excused where equity so requires. Equitable tolling, as explained in *Zipes*, addresses the limitations period for filing an EEOC charge, not the scope of the charge. *Id*. Furthermore, equitable tolling is only granted to a Plaintiff who "(1) diligently pursued his claim; (2) was misinformed or misled by the administrative agency responsible for processing his charge; (3) relied in fact on the misinformation or misrepresentations of that agency, causing him to fail to exhaust his administrative remedies; and (4) was acting *pro se* at the time." *Walton v. Guidant Sales Corp.*, 417 F.Supp.2d 719, 721 (D.Md. 2006), *aff'd*, No. 06-1351, 2006 WL 2974337 (4th Cir. Oct. 17, 2006)(Unpublished Disposition). Although Plaintiff's attorney was not present when he filed the charge, there is no evidence in the record that he pursued an accommodation claim or that he was misinformed or misled by the EEOC.

Nor is there any other basis upon which an accommodations claim could be construed to bear a reasonable relationship to the allegation that Plaintiff was terminated because of a disability. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996). Plaintiff simply asks the court to expand his claim

11

for discriminatory discharge to encompass an accommodation claim. He offers no authority for this proposition; on the contrary, discriminatory discharge is a separate and distinct theory of liability from a failure to accommodate. *Rankin v. Greater Media, Inc.*, 28 F.Supp.2d 331, 340 (D.Md. 1997); *Mayers*, 131 F.Supp.2d at 747. Accordingly, Plaintiff has failed to exhaust his failure to accommodate claim.

Even if the accommodation claim had been exhausted, it fails substantively. It is based solely on Defendant's denial of a substitute position, and Plaintiff bears the burden of producing evidence that a suitable vacancy existed at the time he sought another position. *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 567 (2nd Cir.), *cert. denied*, 531 U.S. 931 (2000). Plaintiff has produced no evidence that any alternative position was available for which he was qualified.[2]

More fundamentally, as discussed below, Plaintiff was not an individual with a disability within the meaning of the ADA. As such, he cannot establish a *prima facie* case for failure to accommodate and summary judgment as to that claim will be granted for the Defendant.

---

[2] The only other positions that Defendant had open were in other states and required certifications that the Plaintiff did not possess. (Paper 31, Ex. 3, Neal Dep. at 143).

B.  <u>Discriminatory Discharge</u>.

Section 12112(a) of the ADA prohibits discrimination against a qualified individual with a disability because of the disability in regard to, *inter alia*, discharge of employees.  The Act defines a "disability" as "with respect to an individual-- (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2), *see also* 29 U.S.C. § 705(20)(B) (1998). "Major life activities" are defined as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.29(I) (2001).

> An individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. . . .
> It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment.  Instead, the ADA requires those "claiming the Act's protection... to prove a disability by offering evidence that the extent of the limitation [caused by the impairment] in terms of their own experience... is substantial."

*Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002) (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999)).  The impairment's impact must be "permanent or long-term." *Toyota Motor*, 534 U.S. at 198.  "An impairment simply cannot be a substantial limitation on a major life activity if it is expected

13

to improve in a relatively short period of time." *Pollard v. High's of Balt., Inc.*, 281 F.3d 462, 468 (4th Cir. 2002), *cert. denied*, 537 U.S. 827 (2002).

Plaintiff asserts that the injury to his right hand substantially limits the major life activities of caring for himself and working. He alleges that his injury caused him to need assistance in getting prepared for the day, such as with brushing his teeth and tying his shoes, but his own testimony reveals that this was temporary; he now lives alone and is able to complete these tasks. (Paper 36, Ex. 3, Neal Dep. at 12-13, 73-74). Nor has he presented any medical evidence of a substantial limitation.

In addition, the undisputed evidence shows that Plaintiff's injury was not considered permanent or long term. Dr. Higgins concluded that Plaintiff could return to his previous work (Paper 32, Ex. 10), and Dr. Jabs released Plaintiff from work hardening as of April 28, 2004. (Paper 32, Ex. 9). Impairments suffered while "recuperating from surgery are not evidence of a permanent disability." *Pollard*, 281 F.3d at 469. Furthermore, "[d]octors' evaluations, which indicate that an individual's impairment is improving, are persuasive evidence that the impairment is expected to be only temporary." *Id*. There is no evidence that Plaintiff's impairment was, or was expected to be, permanent at the time of his termination. Indeed, the only evidence available to Defendant

indicated that Plaintiff's injury had resolved and that he was ready and able to return to work.

In addition, to be substantially limited in the major life activity of working, "one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492 (1999).  The claimant must "demonstrate that she is unable to work in a broad range of jobs." *Pollard*, 281 F.3d at 471.  Obtaining a new job is evidence that an impairment is not substantially limiting.  *Id*.  Here, Plaintiff does not even show that he cannot work in the particular job at issue, much less a broad range of jobs, and he has shown that he can work in other capacities.[3]

Plaintiff also asserts that he has a record of disability, pointing to the notes from work hardening. (Paper 36, Ex. 5).  In order to establish that he had a record of disability, Plaintiff must establish that he has "a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  29 C.F.R. § 1630.2(k)(2000).

> This part of the definition is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment.  The impairment indicated

---

[3] For example, he can handle the lifting requirements of his job as an automotive parts counter clerk.  (Paper 36, Ex. 3, Neal Dep. at 20).  As a courtesy driver, Plaintiff compensates with his left hand so that he can carry out his work tasks.  *Id*. at 16.

> in the record must be an impairment that would
> substantially limit one or more of the
> individual's major life activities.  There are
> many types of records that could potentially
> contain this information, including but not
> limited to, education, medical, or employment
> records.

20 C.F.R. pt. 1630 App., § 1630.2(k).  A record of injury by itself does not establish a covered "record of a disability."  *See, e.g., Kresge v. Circuitek*, 958 F.Supp. 223, 225 (E.D.Pa. 1997) (plaintiff's record of knee operations did not render him "disabled" under ADA when none of the knee injuries was substantially limiting).  Even though Plaintiff's work hardening records indicate that he was still injured, they do not establish that he had a substantially limiting impairment.  And there is certainly no evidence that Defendant relied on such record.  To the contrary, the only evidence indicates that Defendant relied solely on records showing that Plaintiff was not disabled when it terminated him.  (Paper 32, Ex. 1, Murphy Aff. at 2).

In the alternative, Plaintiff alleges that he was regarded by Defendant as being substantially limited in the major life activity of working.  In order to demonstrate that he was regarded as disabled, Plaintiff must show that, "(1) [his] employer 'mistakenly believe[d] that [he] has a physical impairment that substantially limits one or more major life activities,' or (2)[his] employer 'mistakenly believe[d] that an actual, nonlimiting impairment substantially limits one or more major life activities.'"  *Rhoads v.*

*Fed. Deposit Ins. Corp.*, 257 F.3d 373, 390 (4th Cir. 2001) (quoting *Haulbrook v. Michelin North America, Inc.*, 252 F.3d 696, 702-03 (4th Cir. 2001)), *cert. denied*, 535 U.S. 933 (2002), *leave to request reh'g denied*, 536 U.S. 952 (2002).

Again, there is no evidence that Defendant ever regarded Plaintiff as being permanently disabled.  The only evidence Defendant had regarding Plaintiff's condition was Dr. Jabs' report that Plaintiff was released to full duty on April 28, 2004, (Paper 32, Ex. 9), and Dr. Higgins' recommendation that Plaintiff return to work.  (Paper 32, Ex. 10).  Thus, weekly  reports prepared by Ms. Murphy indicate that Plaintiff was expected to return to work as of April 28, 2004.  (Paper 32, Ex. 26).  No evidence exists to show that Defendant had any reason to regard Plaintiff as disabled, or even in need of accommodations, at the time of the termination. Accordingly, the undisputed facts show that Defendant did not perceive Plaintiff as disabled for purposes of the ADA.

In sum, and construing the facts in the light most favorable to him, Plaintiff cannot demonstrate that his injury substantially limited a major life activity, that he had a record of a substantial impairment, or that Defendant regarded him as so limited.  Thus, there is no genuine issue of material fact that Plaintiff is not a "disabled individual" under the ADA.

II.  <u>Retaliatory Discharge</u>.

In Count Two of the complaint, Plaintiff alleges that he suffered retaliation for engaging in a protected activity, specifically, requesting reassignment to a light duty job.  This allegation fails.[4]

To establish a *prima facie* case of retaliation, a plaintiff must show (1) that he engaged in protected activity; (2) that the employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the adverse action.  *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997), *cert. denied*, 522 U.S. 1116 (1998), *remanded to* 997 F.Supp. 681 (D.Md. 1998), *abrogated on other grounds by Burlington N. and Santa Fe Ry. v. White*, 126 S.Ct. 2405 (2006).

Defendant argues that Plaintiff cannot establish the first element of the *prima facie* case because Plaintiff could not have had an objectively reasonable belief that his activity was

_____

[4]Although Defendant does not raise an exhaustion challenge to Plaintiff's retaliation claim, it would likely fail for nonexhaustion.  Plaintiff's EEOC charge contains no allegations or facts to support a claim, that Plaintiff either engaged in a protected activity or that he suffered retaliation for doing so. The charge states only that Plaintiff was terminated due to his disability, and Plaintiff did not check the box marked "retaliation" as a basis for discrimination.  (Paper 32, Ex. 22). *See Miles v. Dell, Inc.*, 429 F.3d 480, 492 (4th Cir. 2000)(affirming summary judgment where plaintiff did not check the retaliation box on the charge form and the narrative explaining the charge described only discrimination, not retaliation).

protected by the ADA. According to Defendant, an employee's conduct is only protected participation if that conduct is reasonable.

Defendant's argument is misplaced, as a request for accommodation is a protected participation activity under the ADA without regard to its reasonableness. *See Haulbrook*, 252 F.3d at 706, n.3. According to § 704(a) of Title VII,

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-(3)(a). Protected activity can take the form of either opposing a practice prohibited by Title VII (the opposition clause) or making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII (the participation clause). Opposition activity must be reasonable: "[w]e balance the purpose of the Act to protect persons engaging reasonably in activities opposing ... discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998)(quoting *Hochstadt v. Worcester Found. for Experimental Biology*, 545 F.2d 222, 231 (1st Cir. 1976). Application of the participation clause, however, does not involve a reasonableness

19

test.  *Glover v. South Carolina Law Enforcement Div.*, 170 F.3d 411, 414 (4th Cir. 1999), *cert. dismissed*, 528 U.S. 1146 (2000). "Reading a reasonableness test into section 704(a)'s participation clause would do violence to the text of that provision and would undermine the objectives of Title VII."  *Id.*  "[T]he scope of protection for activity falling under the participation clause is broader than for activity falling under the opposition clause." *Laughlin*, 149 F.3d at 259 n. 4.  Defendant's attempt to impose the reasonableness test of the opposition clause on Plaintiff's activity fails.  A request for accommodation is a protected participation activity, not subject to a reasonableness requirement.[5]

As to the second element of a *prima facie* case of retaliation, it is undisputed that Plaintiff suffered the adverse action of termination.  *See Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 775 (4th Cir. 1997) (noting that termination is an adverse employment action).  As to the causal connection element, Plaintiff cites the time proximity between his accommodation request in March of 2004 and his termination on May 12, 2004.  (Paper 32, Ex. 14).

---

[5]Plaintiff asserts, without citing any authority, that his involvement in workers' compensation qualifies as a protected activity.  (Paper 36 at 7).  Maryland law, not the ADA, covers retaliation for filing a workers' compensation claim.  For instance, Md. Code Ann., Lab. & Empl., § 9-1105 (a), provides: "An employer may not discharge a covered employee from employment solely because the covered employee files a claim for compensation under this title."

Evidence that the alleged adverse action occurred shortly after an employer became aware of the protected activity can be sufficient to satisfy the causal connection element of a *prima facie* case. *See Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998).   The passage of as much as four months may still be sufficient temporal proximity to infer a causal connection.   *See Allen v. Rumsfeld*, 273 F.Supp.2d 695, 708 (D.Md. 2003).   Since Plaintiff was terminated approximately six weeks after inquiring about other positions, temporal proximity exists.

Once a *prima facie* case of retaliation is established, the Defendant must articulate a reasonable, non-retaliatory reason for the termination.   *Haulbrook*, 252 F.3d at 706. Then the burden shifts to the Plaintiff to show that the proffered reason is a pretext for the termination.   *Id.*   Plaintiff may "succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, *remanded to* 647 F.2d 513 (5th Cir. 1981).   Unsubstantiated allegations and bald assertions, however, are insufficient. *Evans*, 80 F.3d at 960.   "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."

21

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).   But, "[i]t is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination."   *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993).   Proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct."   *Id*. at 524.

Defendant has articulated a non-discriminatory basis for the termination:   Plaintiff's failure to report to work after being released on May 4, 2004.   (Paper 32, Ex. 14).   Defendant became aware that Plaintiff was released on May 4, 2004, and promptly attempted to contact him about returning to work.   (Paper 32, Ex. 1, Murphy Aff. at 3).   After eight days without contact from the Plaintiff, Defendant terminated him.   (Paper 32, Ex. 14). This failure to return to work is undisputed.   Plaintiff contends that the Defendant's reason was a cover up, and that retaliation was more likely than not the true  motivation behind the termination. But other than his subjective belief that he was terminated due to his accommodation request rather than his failure to return to work, Plaintiff has submitted nothing.   There is neither evidence of, nor a basis upon which to infer, that Defendant's stated reason for the termination is pretextual.   Because the circumstances

22

cannot support a finding of pretext, Defendant is entitled to summary judgment on the retaliation claim.[6]

## CONCLUSION

For all of the aforementioned reasons, the Court will grant Defendant's Motion for Summary Judgment.  An Order consistent with this Opinion will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

---

[6]Defendant seeks sanctions for misstatements of fact in Plaintiff's Opposition to Defendant's Motion for Summary Judgment, pointing to his assertions that he was not released by Dr. Jabs and Dr. Higgins.  (Paper 37 at 1).  The court will view these statements liberally, as argument rather than misstatements of fact, and therefore will not impose sanctions.